UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                              )
CYNTHIA L. ESPOSITO,          )
Individually and as the       )
Executrix of the Estate of    )
Roselyn Esposito, and BERNARDO )
ESPOSITO,                     )
                              )
          Plaintiffs,         )
                              )
     v.                       )     C.A. No. 09-563 S
                              )
NOVARTIS PHARMACEUTICALS       )
CORPORATION,                  )
                              )
          Defendant.          )
_____)

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, Chief Judge.

        Plaintiffs, Cynthia Esposito, executrix of the estate of

decedent Roselyn Esposito ("Mrs. Esposito"), and Bernardo

Esposito, Mrs. Esposito's husband, have filed a personal injury

suit against Defendant Novartis Pharmaceuticals Corporation

("NPC") for harm caused by the drug Zometa to Mrs. Esposito.

Before the Court is NPC's Motion for Summary Judgment (ECF

No. 13), claiming that Plaintiffs' suit is time-barred.  For the

reasons set forth below, NPC's Motion for Summary Judgment is

DENIED.

I.   Background

Plaintiffs' claims stem from Mrs. Esposito's development of bisphosphonate-related osteonecrosis of the jaw ("BRONJ") after being treated with the drug Zometa, manufactured by NPC.  Zometa is administered to counteract the effects of cancer that has spread to the bones.  (NPC's Statement of Undisputed Facts ("SUF") ¶¶ 7-9, ECF No. 14.)  Plaintiffs seek damages for Mrs. Esposito's injuries and her husband's loss of consortium, premised on strict product liability, failure to warn, negligence, and breach of warranty under Rhode Island law.

Plaintiffs initially sued NPC in Rhode Island Superior court on October 23, 2009.  NPC removed on diversity grounds, after which the case was transferred to the Middle District of Tennessee for coordinated or consolidated pretrial proceedings, and then transferred back to this court (Electronic Transfer Order, ECF No. 4).  NPC claims that Plaintiffs' action is time-barred because Plaintiffs failed to file suit within three years after the cause of action accrued.  Because, NPC argues, the undisputed facts show as a matter of law that Mrs. Esposito knew or should have known that she had a cause of action against NPC well before October 23, 2006, it is entitled to summary judgment.

2

II.  Facts[1]

Mrs. Esposito was diagnosed with renal cell carcinoma and underwent surgery to remove a kidney in July 2002. (SUF ¶¶ 29-30.) In September 2003, she was diagnosed with metastatic cancer after her clavicle was pathologically fractured. (Id. at ¶ 31.) She subsequently underwent various forms of radiation treatment, and in November 2003, began to receive Zometa therapy, prescribed by her oncologist, Dr. Sundaresan Sambandam, to slow the advancement of cancer-induced bone damage. (Id. at ¶¶ 31-34.) Dr. Sambandam testified that he first learned about the association between Zometa and osteonecrosis of the jaw ("ONJ") at some point in 2004. (Id. at ¶ 39.)

On August 19, 2005, Dr. E. Joseph Domingo, an oral surgeon, extracted one of Mrs. Esposito's teeth. (Id. at ¶ 42.) Dr. Domingo testified that although he was aware that invasive dental procedures were not recommended for patients taking Zometa due to the risk of ONJ, Mrs. Esposito had not informed him of her ongoing Zometa treatment. (Id. at ¶ 43.) Mrs.

---

[1] Plaintiffs do not dispute the facts submitted by NPC, which are thus deemed admitted. However, NPC disputes Plaintiffs' characterization of certain records and testimony. The facts set forth here rely upon the records submitted by both parties in support of their factual statements, rather than Plaintiffs' characterizations of those records.

3

Esposito's Zometa treatment was discontinued in October 2005. (Id. at ¶ 38.)

On February 22, 2006, Mrs. Esposito's dentist, Dr. Kerry Callery, extracted another tooth, and noted in subsequent visits in late March that Mrs. Esposito's bone was exposed at the site of the extraction. (Id. at ¶¶ 44-46.) On April 3rd, another dentist noted that Mrs. Esposito had exposed bone, but no pain or swelling. (Id. at ¶ 47; NPC Ex. 40, ECF No. 14-40; Domingo Dep. Tr. 49:6-21, NPC Ex. 36, ECF No. 14-36.)

On April 11, 2006, Dr. Domingo saw Mrs. Esposito again and found out that Mrs. Esposito was taking Zometa. (SUF ¶ 48.) He recorded that he "[e]xplained to patient the effects of Zometa on healing." (Id.) His noted "Assessment" was "Bisphosphonate osteonecrosis" and according to his notes and testimony, he prescribed Peridex, an antibacterial mouth rinse. (Id.) Dr. Domingo testified that he did not recall what he told Mrs. Esposito at this visit or whether he would have correlated Zometa with her condition at that point, that he "probably wouldn't" use the term "bisphosphonate osteonecrosis," and as for his "assessment," he stated, "it looks like I was coming to the conclusion that it was possible from the medication that she had taken." (Id. at ¶ 50; Plaintiffs' Statement of Undisputed

Facts ("PUF") ¶¶ 25-27, ECF No. 16-26; Domingo Dep. Tr. 54:6-57:10, Pls. Ex. 22, ECF No. 16-22.)

On May 26, 2006, Mrs. Esposito visited an urgent care clinic complaining of a sore area on her tongue. (SUF ¶ 51.) According to her treating physician's notes, Mrs. Esposito complained that her tongue was rubbing against the area where her teeth had been pulled, and "said she had cancer and took [some] medication and she said it had affected the bone in the area." (Id.) The physician determined that Mrs. Esposito had an ulcer on her tongue, and wrote in her "Assessment and Plan" that she would give Mrs. Esposito "Magic Mouth Wash." (NPC Ex. 41, ECF No. 14-41.)

On June 2, 2006, Dr. Sambandam, Mrs. Esposito's oncologist, made positive notes on Mrs. Esposito's status in the "Subjective" section of his report, but noted:

> One thing she is bothered by is a couple of loose teeth which she took out. Unfortunately after the tooth has been taken out she has a tough time healing the lesion. Now she has osteonecrosis of the mandible. She has a dry area and an ulcer in the tongue. . . . She has no other systemic symptoms present. She has been having no pain or discomfort.

(SUF at ¶ 52; NPC Ex. 42, ECF No. 14-42.) At Dr. Sambandam's deposition, although he agreed that the "Subjective" section of his report is where he records what the patient reported, when asked if he wrote this because Mrs. Esposito reported it to him,

he did not know, could not recall the conversation, and could not recall whether he discussed ONJ with her. (SUF ¶ 53; PUF ¶ 11; Sambandam Dep. Tr. 88:18-91:5, Pls. Ex. 21, ECF No. 16-21.)  In the "Objective" part of his report, Dr. Sambandam describes "open wounds on the left side of the mandible," and notes "[s]he really is looking good except for this." (NPC Ex. 42, ECF No. 14-42.)  His "Assessment" states "I am happy that everything else is looking good." (Id.)

On June 14, 2006, Dr. Sambandam saw Mrs. Esposito again, and noted in the "Subjective" portion of his report that Mrs. Esposito "feels overall okay except for a problem with her tongue and the short area of avascular necrosis of the mandible irritating the lateral bottom of the tongue." (SUF ¶ 54; NPC Ex. 43, ECF No. 14-43.)  He goes on to list his findings, the majority of them positive, and writes in his plan that he would "probably send her [to] Dr. VanDongen who has experience with radiation induced avascular necrosis. . . . I think he is a good resource who might be able to help us."[2] (NPC Ex. 43, ECF No. 14-43.)

---

[2] Plaintiffs assert, and Defendants dispute, that Dr. Sambandam attributed the necrosis to radiation treatment. Dr. Sambandam's testimony on this matter was inconclusive. (See Sambandam Dep. Tr. 109:5-113:14, Pls. Ex. 21, ECF No. 16-21.) He stated: "We talked about everything. You know, one of the things was radiation." (Id. at 109:12-13.) He explained, "we

On September 27, 2006, Dr. Sambandam again evaluated Mrs. Esposito, and states in his report that she "has been treated in the past with Zometa and she has done well with it. Unfortunately, she developed necrosis of the mandible." (SUF ¶ 55.)  The section titled "Subjective Complaints," mentions nothing relating to ONJ, but symptoms are described in "Objective Findings," where Dr. Sambandam reports that Mrs. Esposito "has tenderness in the left mandible near the angle of the mandible where she has a lesion present.  She has an infection there.  I put her on antibiotics now." (NPC Ex. 29, ECF No. 14-29.)  Dr. Sambandam testified that he could not recall what Mrs. Esposito told him at this visit, that there are several possible reasons people develop osteonecrosis, and that he thought Zometa was a "contributor," but did not form an opinion "to a reasonable degree of medical certainty" as to the cause of Mrs. Esposito's condition. (Sambandam Dep. Tr. 92:9-95:3, Pls. Ex. 21, ECF No. 16-21.)

---

know more radiation than Zometa accumulative, so [Dr. VanDongen] has a lot more experience with the avascular necrosis.  So that's the reason why I used the word 'avascular' necrosis, because that's what he did. . . . [He] used to work in the radiation oncology department, so he saw a lot of radiation-induced necrosis." (Id. at 112:21-113:5.)  Dr. Sambandam further stated, "[W]hat I thought was, he will be a man who would know this, to how [sic] deal with it." (Id. at 113:11-14.)

7

On October 10, 2006, Mrs. Esposito visited Dr. Domingo, who noted that there had been no change in the area of the exposed bone, "although tissue appears healthier," and that Mrs. Esposito had not been taking any pain medication. (SUF ¶ 56; NPC Ex. 44, ECF No. 14-44.) He writes, "[d]iscussed again the effects of Zometa and the limited treatment available." (Id.) He testified that he understood the effects of Zometa to be "[d]elayed healing . . . , leading to osteonecrosis." (Domingo Dep. Tr. 71:22-73:10, NPC Ex. 36, ECF No. 14-36.) He further stated, "I don't recall the conversation with Miss Esposito exactly. But from my notes, it sounds like that's what I was explaining to her." (Id. at 73:11-23.)

Mrs. Esposito went to another oral surgeon, Dr. Brian P. Hogan, on October 17, 2006, who, in a letter dated October 20, 2006, writes to Dr. Fisher that Mrs. Esposito "presents with exposure of the left mandibular osseous tissue." (SUF ¶ 57; NPC Ex. 45, ECF No. 14-45.) He writes that Mrs. Esposito claims that this condition developed following extractions, and that "[s]he claims that at times she has had significant swelling but at this point she feels more comfortable." (Id.) He explains that "the panoramic radiograph taken today reveals an osteolytic area of the left body of the mandible consistent with recent extractions and osteonecrosis which is also consistent with her

8

history of Zometa IV bisphosphate therapy," but that "we have no current treatment protocol for bisphosphate osteonecrosis." (Id.)  Nothing in the record indicates how much of this information was conveyed to Mrs. Esposito, in what terms, or when.

Plaintiff Cynthia Esposito testified that her mother's jaw pain "would come and go, but then it was constant."  (Cynthia Esposito Dep. Tr. 177:23-178:3, Pls. Ex. 23, ECF No. 16-23.) According to the notes of Catherine Viens, a psychiatric clinical nurse specialist whom Mrs. Esposito saw on October 27, 2006, Mrs. Esposito was "reporting on and off pain."  (NPC Ex. 46, ECF No. 14-46.)  Nurse Viens noted that Mrs. Esposito "presents with a left swollen jaw reporting that she has an infection.  She had teeth pulled last year but secondary to a cancer medication, this area will not heal.  The patient is now taking penicillin."  (Id.)

On February 28, 2007, Mrs. Esposito saw Dr. Sambandam, who notes that Mrs. Esposito "had developed osteonecrosis in her jaw because of the Zometa.  She is now managing.  She is taking Penicillin trying to keep things good."  (Pls. Ex. 9, ECF No. 16-10.)  On March 5, 2007, Dr. Ray English, an oral surgeon, diagnosed Mrs. Esposito with "Zometa induced osteonecrosis of mandible."  (Pls. Ex. 10, ECF No. 16-11.)  Cynthia Esposito and

9

Bernardo Esposito both testified that they first heard that Zometa caused Mrs. Esposito's ONJ after her visit with Dr. English. (Cynthia Esposito Dep. Tr. 18:6-21, Pls. Ex. 23, ECF No. 16-23; Bernardo Esposito Dep. Tr. 12:11-13:9, Pls. Ex. 24, ECF No. 16-24). Mr. Esposito testified that he "brought [Mrs. Esposito] to many doctors" before determining the cause of his wife's condition. (Bernardo Esposito Dep. Tr. 13:20-24, Pls. Ex. 24, ECF No. 16-24.) When describing what his wife had done after her second tooth was extracted and her jaw wouldn't heal, he stated: "She was worried. We started seeing oral surgeons all over the place to find out what the hell is going on." (Id. at 37:9-15.) He further testified that "[n]obody knew," and that no medication was prescribed as far as he knew because "[n]obody knew what it was." (Id. at 37:16-23.)

In the Affidavit of Cynthia Esposito submitted by Plaintiffs in support of their opposition to NPC's Motion for Summary Judgment (ECF No. 16-25),[3] Cynthia Esposito states that, "as a result of the information received by me and my mother in

---

[3] NPC contests Plaintiffs' submission of the Affidavit, claiming that it consists of hearsay because it contains facts for which Cynthia Esposito does not have adequate personal knowledge under Federal Rule of Evidence 602. With the exception of several paragraphs mentioning what Mrs. Esposito "felt" or "thought," the Affidavit appears to be based on Cynthia Esposito's personal knowledge. The Court does not base its decision on the statements NPC contends are hearsay.

the Spring of 2007, I began to investigate Zometa on the internet and learned of the wrongdoing of [NPC]."

Medical records document the worsening of Mrs. Esposito's BRONJ. Her pain and swelling increased and she had difficulty swallowing or eating. (Pls. Ex. 11, ECF No. 16-12.) Her jaw bone fractured in multiple places, she developed a broken abscess draining mucus to her sinus and chronic bone infection (id.), and by 2008, she had developed a fistula draining from her mouth to her neck, and was diagnosed with "Stage III bisphosphonate-related osteonecrosis of the jaw." (Pls. Ex. 17, ECF No. 16-18.) Dead bone in her jaw broke off internally. (Pls. Ex. 18, ECF No. 16-19.) According to Cynthia Esposito's deposition testimony, "[a] piece of the jawbone was sticking up inside of her – the top," after which Dr. English performed a debridement. (Cynthia Esposito Dep. Tr. 180:9-23, Plaintiffs' Ex. 23, ECF No. 16-23.) Dr. Sambandam's February 13, 2008 report states that Mrs. Esposito "is giving up." (Pls. Ex. 19; ECF No. 16-20.) Mrs. Esposito passed away in November of 2008 from a recurrence of cancer. (Plaintiff's Fact Sheet, NPC Ex. 37, ECF No. 14-37.)

## III. Discussion

Summary judgment is appropriate when, viewing the record in the light most favorable to the non-moving party, there is no

11

genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009). The district court must determine "whether there exists evidence such that a reasonable jury could return a verdict for the nonmoving party." Perry v. Roy, 782 F.3d 73, 78 (1st Cir. 2015) (internal citation and quotation marks omitted). Because this case was removed to federal court on diversity grounds, Rhode Island law applies. Nicolo v. Philip Morris, Inc., 201 F.3d 29, 33 (1st Cir. 2000).

Rhode Island General Laws § 9-1-14(b), which governs personal injury suits, dictates that all claims be filed within three years of the accrual of the cause of action. Whereas a cause of action generally accrues at the time of the injury, Rhode Island uses a "discovery rule" in drug product-liability actions. R.I. Gen. Laws § 9-1-14.1; Anthony v. Abbott Labs., 490 A.2d 43, 46 (R.I. 1985). Under this rule, for injuries "which could not in the exercise of reasonable diligence be discoverable at the time of the occurrence of the incident which gave rise to the action," a plaintiff must file suit "within three (3) years of the time that the act or acts of the malpractice should, in the exercise of reasonable diligence, have been discovered." R.I. Gen. Laws § 9-1-14.1.

12

In drug product-liability actions, manifestation of the injury or the discovery of its cause does not by default trigger the running of the statute of limitations. Anthony, 490 A.2d at 46; see also Arnold v. R.J. Reynolds Tobacco Co., 956 F. Supp. 110, 113-14 (D.R.I. 1997). Rather, the statute of limitations begins to run at the point when the plaintiff should have, with reasonable diligence, discovered the drug manufacturer's wrongful conduct. Anthony, 490 A.2d at 46.

Anthony explains the rationale behind this rule: "In the case of a drug product, it cannot be thought that because a person experiences the adverse effect of a particular drug, she will or should assume that it was the result of wrongful conduct on the part of the manufacturer; the normal reaction would be otherwise." Anthony, 490 A.2d at 47. The person could "assume that the result suffered is an unavoidable risk of a treatment, which because of the treatment's general efficacy, is considered acceptable by medical standards, or that it is simply an unforeseeable consequence beyond anyone's control or responsibility." Id. (quoting Dawson v. Eli Lilly & Co., 543 F. Supp. 1330, 1337 (D.D.C. 1982)); see also Renaud v. Sigma-Aldrich Corp., 662 A.2d 711, 715 (R.I. 1995) ("It is not until . . . the person learns that such adverse effects are not an expected or a predictable consequence of proper treatment that

13

he or she could possibly be aware that a cause of action exists against the drug manufacturer." (citing Anthony, 490 A.2d at 47)).

As the Court further clarified in Arnold, it is reasonable for a person to initially assume that side effects of a prescription drug are either unavoidable or acceptable by medical standards – such an assumption derives from "the reality of medical treatment." 956 F. Supp. at 114-15. Arnold explains:

> [M]edications can have side effects, a patient is often willing to bear some side effects in order to realize the curative effects of the drug, and the patient relies on a physician to properly weigh the medical benefits and risks (both known and unknown) when prescribing the medication. Thus, mere knowledge of the causal link between the drug and the injury is often insufficient to alert the patient that there may be a cause of action against the manufacturer — as far as the patient can tell, the drug worked as best as the patient and doctor could expect. Therefore, the Court in Anthony found it proper to toll the limitations period until the patient could discover that the underlying assumption was wrong, i.e., that the adverse side effects were not an expected or acceptable consequence of proper medical treatment.

Id. (citing Anthony, 490 A.2d at 46–48).

The factfinder must determine whether the plaintiff exercised reasonable diligence in his or her discovery of the wrongful conduct, or whether the plaintiff should have discovered the wrongful conduct earlier. Anthony, 490 A.2d at

14

48; see also Zuccolo v. Blazar, 694 A.2d 717, 719 (R.I. 1997) (where plaintiff continued to search for confirmation of his suspicions regarding the cause of his joint problems, despite misdiagnosis by several doctors, the court could not "conceive of a set of facts that would more clearly demonstrate the concept of reasonable diligence as set forth in § 9-1-14.1(b)"). Under Anthony's rule, the finder of fact must consider "when a reasonable person in circumstances similar to plaintiffs' would have discovered a defendant's wrongful conduct." Anthony, 490 A.2d at 48. In evaluating these circumstances, the information a patient actually received from his or her doctor must be taken into account, see, e.g., Zuccolo, 694 A.2d at 719, as does the state of common knowledge regarding the injury associated with the product, see Arnold, 956 F. Supp. at 115 n.8.

Thus, the question before the Court is whether a genuine issue of material fact exists as to whether a "reasonable person in circumstances similar to [Mrs. Esposito's]" would have discovered NPC's wrongful conduct prior to October 23, 2006. Anthony, 490 A.2d at 48.

Taking into account Plaintiffs' concession of NPC's Undisputed Facts, but viewing the facts in the light most favorable to Plaintiffs, it is reasonable to infer that in 2005 and 2006 when Mrs. Esposito had teeth extracted, she had not

15

been meaningfully apprised of Zometa's risk for causing ONJ subsequent to extractions. On April 11, 2006, after the site of Mrs. Esposito's extracted tooth did not heal, Dr. Domingo's notes state that he informed Mrs. Esposito of "the effects of Zometa on healing." Although Dr. Domingo wrote "Bisphosphonate osteonecrosis" in his own assessment, he testified that he likely would not have used that specific term in his explanation to Mrs. Esposito. Mrs. Esposito was not yet suffering from any pain deriving from ONJ. Thus, contrary to NPC's assertions, it would not be unreasonable to infer that at the April 11th visit with Dr. Domingo, Mrs. Esposito was not provided an actual ONJ diagnosis, and would not have had any reason to suspect that any wrongdoing had occurred.

On May 26, 2006, when Mrs. Esposito visited an urgent care clinic due to a sore area of her tongue, she indicated that a cancer medication she had taken had impacted the bone in her mouth, and was prescribed "Magic Mouth Wash." The term osteonecrosis or ONJ is absent from the report. At this point, it cannot be seriously disputed that Mrs. Esposito knew she was experiencing discomfort related to a side-effect of Zometa. However, it would be reasonable to infer that Mrs. Esposito did not yet have any indication that this side-effect was neither "acceptable by medical standards" nor "an unforeseeable

16

consequence   beyond   anyone's   control   or   responsibility."
Anthony, 490 A.2d at 47.

Dr. Sambandam's reports of Mrs. Esposito's subsequent three
visits on June 2, 2006, June 14, 2006, and September 27, 2006
largely   indicate   that   he   was   satisfied   with   her   overall
condition.   Although   he   addresses   her   bone-healing   problems,
treats   an   infection,   and   directs   her   to   a   doctor   familiar   with
"radiation-induced   avascular   necrosis,"   his   positive   statements
could   reasonably   lead   to   the   inference   that,   having   viewed   her
symptoms   of   ONJ,   he   himself   viewed   them   as   medically   acceptable
side   effects.   Notably,   he   testified   that   while   his   notes
document   ONJ,   he   did   not   know   or   recall   whether   he   discussed   ONJ
with Mrs. Esposito during these visits.

After   Mrs.   Esposito's   October   10,   2006   visit   with   Dr.
Domingo,   he   notes   no   change   in   the   affected   area,   as   well   as   an
apparent   improvement.   Dr.   Hogan,   the   oral   surgeon   Mrs.   Esposito
subsequently   visits,   writes   a   letter   to   Mrs.   Esposito's   primary
care   physician   on   October   20,   2006,   stating   that   her   symptoms
are   "consistent   with"   the   extractions   of   her   teeth,   and   "also
consistent   with"   her   prior   Zometa   treatment.   While   his   notes
mention   ONJ,   it   is   not   clear   what   he   told   Mrs.   Esposito
directly.

17

Nurse Viens' October 27, 2006 notes echo those of the urgent care physician Mrs. Esposito saw on May 26, 2006. Mrs. Esposito reports having an infection, and that following a cancer medication, the area would not heal. Nurse Viens' notes, which appear to reflect Mrs. Esposito's own words, do not convey any greater understanding by Mrs. Esposito of her condition, or that she knew she had been diagnosed with a specific, permanent condition rather than mere healing problems.

Thus, by October 23, 2006, while Mrs. Esposito had experienced sporadic pain and trouble healing an area in her mouth, the record does not show as a matter of law that she should have known her symptoms were caused by someone's wrongdoing. See Espada v. Lugo, 312 F.3d 1, 3-4 (1st Cir. 2002) (in medical malpractice suit, finding that lymphedema diagnosis did not necessarily put plaintiff on notice of wrongdoing, because "'knowledge of the author of the harm means more than an awareness of some ill effects resulting from an operation by a particular doctor'" (quoting Galarza v. Zagury, 739 F.2d 20, 24 (1st Cir. 1984)); Arnold, 956 F. Supp. at 114-15 (explaining that while a smoker should be immediately aware that smoking-related illness is not an acceptable consequence, a "wrongful conduct" standard applies in prescription drug lawsuits because a patient would reasonably excuse a prescription drug's adverse

18

side effects).  It is debatable if or when any of the doctors Mrs. Esposito had seen through October 23, 2006 treated the ONJ as anything other than a medically acceptable side effect of her cancer medication.  Her husband testified that despite going to numerous oral surgeons, Mrs. Esposito did not immediately learn what was "going on."  It indeed appears that Mrs. Esposito went to multiple oral surgeons through and after October 2006, corroborating his testimony.

Significantly, while medical records up to this point use the term ONJ and osteonecrosis, NPC points to no testimony where a doctor states that he or she recalls informing Mrs. Esposito that she in fact had developed a condition called osteonecrosis of the jaw or bisphosphonate-related osteonecrosis.  See Van Eman v. Novartis Pharm. Corp., No. CIV. A. 11-792, 2013 WL 5603473, at *4-6, 10 (W.D. Pa. Oct. 10, 2013) (finding a genuine issue of material fact as to whether plaintiff who had taken Zometa should have discovered his injury at the point when he had exposed bone and doctor informed him of "potential for osteonecrosis of the jaw"); see also Wilson v. El-Daief, 964 A.2d 354, 365 (Pa. 2009) ("While we reiterate that knowledge of 'injury' and 'cause' does not require a precise medical diagnosis, we decline to hold, as a matter of law, that a lay person must be charged with knowledge greater than that which

19

was communicated to her by multiple medical professionals involved in her treatment and diagnosis."). Moreover, it is not evident as a matter of law that by late October 2006, Mrs. Esposito should have known that, in addition to mere healing problems and an infection, she had a chronic condition that she could expect to ultimately result in disfigurement, a permanently fractured jaw bone, and constant pain. Unlike cancer, the typical progression of bisphosphonate-related osteonecrosis of the jaw is not a matter of common knowledge.

According to the record, Mrs. Esposito did not begin to experience difficulty swallowing or eating, chronic osteomyelitis, or pathologic fractures of her jaw bone until May 2007, and only later did her bone protrude inside her mouth, requiring surgery. While "Stage III bisphosphonate osteonecrosis" is documented in January of 2008, nothing in the record indicates when stages 1 or 2 began. See Stromenger v. Novartis Pharms. Corp., No. 3:12-CV-00686-HU, 2012 WL 6649186, at *7 (D. Or. Oct. 22, 2012) report and recommendation adopted, No. 3:12-CV-00686-BR, 2012 WL 6649585 (D. Or. Dec. 18, 2012) (jury could find that complaint was timely where record did not make clear when, during plaintiff's series of infections, Zometa-related "injury" began, or when stages 1 or 2 of osteonecrosis commenced); Van Eman, 2013 WL 5603473, at *10

(finding that the point at which Plaintiff was informed of the link between Zometa and his ONJ did not necessarily set off the limitations period, but rather that "[r]easonable minds could differ as to when Plaintiff sustained his injury and whether he exercised reasonable diligence in pursuing a medical explanation").

Thus, it would not be unreasonable to conclude that as of October 23, 2006, Mrs. Esposito did not yet have cause to believe she might have a cause of action against NPC. Nor do the undisputed facts show that, while Mrs. Esposito was aware of an injury due to Zometa, she was not in fact conducting reasonable diligence at this time by consulting a series of doctors. See Zuccolo, 694 A.2d at 719. Therefore, based on the record, the Court cannot determine whether, as a matter of law, reasonable diligence should have uncovered potential wrongdoing by NPC prior to October 23, 2006.

IV.  Conclusion

For the reasons set forth above, NPC's Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

_____
William E. Smith
Chief Judge
Date:  September 18, 2015